Argued and submitted August 31, 2004, affirmed February 2, 2005

## STATE OF OREGON,
*Respondent,*

*v.*

## JULEAN DON ADICHO,
*Appellant.*

022671FE; A120935

105 P3d 916

Louis R. Miles, Deputy Defender argued the cause for appellant. With him on the brief were Peter A. Ozanne, Executive Director, and Peter Gartlan, Chief Deputy, Office of Public Defense Services.

Elizabeth A. Gordon, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Brewer, Chief Judge, and Leeson, Judge pro tempore.*

LEESON, J. pro tempore.

_____

* Leeson, J. pro tempore, *vice* Armstrong, J.

**LEESON, J. pro tempore**

Defendant appeals his conviction for custodial interference in the second degree. ORS 163.245. He contends that the trial court erred in denying his motion for a judgment of acquittal because the state presented insufficient evidence that he knowingly kept a 14-year-old juvenile, T, from her lawful custodian. We affirm.

In reviewing the denial of a motion for judgment of acquittal, we view the evidence in the light most favorable to the state, accepting reasonable inferences and credibility choices that the factfinder could have made. *State v. Presley*, 175 Or App 439, 443, 28 P3d 1238 (2001). T was born in 1987. After her parents divorced, T lived with her father. She began living with her mother when she was almost 12 years old. Her mother knew that T had a relationship with defendant and she did not approve of it. In May 2001, T ran away from home. In mid-August, a Jackson County juvenile probation officer saw T and defendant together outside a fitness club. She did not arrest T because she did not have handcuffs with her. Instead, she summoned the police, but T ran off before the police arrived. The probation officer told defendant that T was 14 years old, that she was a runaway, and that there was a warrant out for her arrest. The probation officer also told defendant that he needed to call the police if he located T.

Near the end of August 2001, T turned herself in. She was released to her grandmother's custody in mid-September. In mid-November, T ran away again. In early January 2002, the probation officer saw T sitting in defendant's car, which was parked in front of a grocery store. The officer went into the store to call police. While inside, she saw defendant buying beer. By the time the police arrived, defendant, T, and the car were gone.

Thereafter, the probation officer heard that T had been seen around town, including at the restaurant where defendant worked. On January 26, 2002, the probation officer went to the restaurant to ask defendant about T. Defendant told her that he and T had "broken up," that he had not seen her, and that he had been trying to help T's grandmother find the girl. In fact, on December 4, 2001, T had

signed a rental application to live in defendant's apartment, listing a false name and stating that she was 18 years old. Defendant paid an extra $75 per month in rent for T to live in the apartment with him.

On January 31, 2002, police officers went to defendant's apartment, where they found defendant and T together, naked, in defendant's bed. Defendant's landlord said that T had been living in the apartment a "couple of months" before she was taken into custody. Defendant told the officers that he loved T and wanted to marry her and that he was concerned about how much it cost to take care of her.

A grand jury indicted defendant on one count of custodial interference in the second degree.[1] ORS 163.245(1) provides:

> "A person commits the crime of custodial interference in the second degree if, knowing or having reason to know that the person has no legal right to do so the person takes, entices or *keeps* another person from the other person's lawful custodian * * * with intent to hold the other person permanently or for a protracted period."

(Emphasis added.) The indictment alleged that defendant "did unlawfully and knowingly keep [T] from her lawful custodian, with the intent to hold her for a protracted period of time * * *."

At the close of the state's case, defendant moved for a judgment of acquittal, arguing that there was insufficient evidence that he had "kept" T from her custodial parent. He argued that the dictionary offers many definitions for the word "keep" and that the most appropriate definition for the purpose of the custodial interference statute is the one that connotes an element of control over the person and means "not to let go, possession or control." According to defendant, the state failed to prove that defendant had exercised any control over T. The state responded that, because T was a minor, she could not legally consent to stay with defendant and that defendant was wrong that the word "keeps" in ORS 163.245 implies an element of control. The trial court denied

---

[1] Defendant also was indicted for endangering the welfare of a minor, ORS 163.575. The jury acquitted defendant of that charge.

defendant's motion and instructed the jury that the word "keeps" in ORS 163.245 means "to maintain something or somebody in a particular place, situation or condition." The jury found defendant guilty of custodial interference.

■ On appeal, defendant repeats his argument that the state failed to produce sufficient evidence that he "kept" T from her lawful custodian because he did nothing to prevent her from leaving him and he did not control her in any way. The state responds that it produced evidence from which the jury could find, beyond a reasonable doubt, that defendant maintained T away from her lawful custodian.

■ Although defendant does not frame the issue on appeal as a matter of statutory construction, resolution of this matter requires us to construe the word "keeps" in ORS 163.245. Defendant can prevail only if he is correct that the legislature intended the word "keeps" in the statute to connote an element of control. The methodology prescribed in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993), directs us first to the text and context of the statute. The context of a statute includes the Oregon Supreme Court's interpretations of the statute. *State v. Guzek*, 322 Or 245, 255, 906 P2d 272 (1995). If the meaning is not clear from text and context, then we consult legislative history and, if necessary, we apply general maxims of statutory construction. *PGE*, 317 Or at 610-12.

ORS 163.245 identifies three ways that a person commits the crime of custodial interference: the person "takes," "entices," or "keeps" another person from that person's lawful custodian with the prescribed mental intent. In this case, the only dispute is over the meaning of the word "keeps." The statute itself does not define the word. *Webster's Third New Int'l Dictionary* 1235 (unabridged ed 2002) offers many definitions of the verb "keep." Some of those definitions support defendant's proffered understanding, such as "to restrain from departure or removal : not let go of : HOLD, DETAIN * * *; to hold back : RESTRAIN, PREVENT * * *." *Id.* Other definitions of the word support the state's proffered understanding, such as "PRESERVE, MAINTAIN; * * *; to

have the care of : be responsible for * * *; to support by providing with a home, food, clothing, or other requisites of existence * * *; to continue to maintain : not cease from or intermit * * *." *Id.* The context in which "keeps" appears in ORS 163.245 provides no insight into which of the many definitions of the word the legislature intended. Legislative history, however, reveals the legislature's purpose in enacting the statute, which in turn provides a framework for determining whether defendant's proffered definition of "keeps" reflects legislative intent.

ORS 163.245, custodial interference in the second degree, was enacted in 1971 as part of the major revision of Oregon's Criminal Code. Or Laws 1971, ch 743, § 100. This court previously has examined the legislative history of both that statute and ORS 163.257, custodial interference in the first degree. *State v. Dirks*, 35 Or App 33, 581 P2d 85, *rev den*, 284 Or 521 (1978). That examination made clear that the legislature's intent in enacting the custodial interference statutes was "to protect the rights of a person having legal custody of another against invasion by those having no right to custody." *Id.* at 38. *See also State v. Scott*, 36 Or App 15, 17, 583 P2d 1156 (1978), *rev den*, 285 Or 73 (1979) ("The custodial interference statutes are intended to protect the legal custodian's right to custody.").

In light of the legislative history, we return to the word "keeps" in ORS 163.245. The definition that the trial court applied in this case, "to maintain something or somebody in a particular place, situation or condition," advances the legislature's purpose of protecting the legal custodian's right to custody against invasion by those having no right to custody. Defendant's proffered definition does not. The state provided evidence, which defendant does not dispute, from which the jury could and did find, beyond a reasonable doubt, that defendant maintained T away from her lawful custodian. The trial court did not err in denying defendant's motion for a directed verdict.

Affirmed.